DECISION AND JUDGMENT ENTRY
This is an appeal and a cross-appeal from a May 4, 1999 judgment entry of the Lucas County Court of Common Pleas, Domestic Relations Division, in which the court: 1) granted a divorce to appellee/cross-appellant, Mary Janet Myers ("appellee"), from appellant/cross-appellee, Ronald A. Myers, Sr. ("appellant"); 2) ordered a division of property; and 3) ordered appellant to pay appellee spousal support of $150 a month for five years, or until the death of either party or the remarriage or cohabitation of appellee. Appellant has presented two assignments of error for consideration that are:
 "I. THE TRIAL COURT, CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE, FAILED TO FIND THE PLAINTIFF GUILTY OF FINANCIAL MISCONDUCT AND, AS A RESULT, ERRED IN FAILING TO ASSESS A PENALTY AGAINST THE PLAINTIFF FOR SAID FINANCIAL MISCONDUCT.
 "II. THE TRIAL COURT ERRED IN FAILING TO FOLLOW THE MANDATES CONTAINED IN R.C. 3105.18 AND AWARDING ALIMONY TO PLAINTIFF-APPELLEE."
The record shows that the parties were married on May 6, 1967 in Toledo, Ohio. All children born to them during the marriage were emancipated by the time of the divorce. Both parties agreed that they are now incompatible, and the trial court granted the divorce on that basis. The testimony of the parties shows that a main source of the difficulty between them was differing viewpoints about how to handle finances. Further specific facts relating to that difficulty will be recounted in our discussion of the assignments of error.
In support of his first assignment of error, appellant argues that the trial court erred when it ordered him to pay a portion of the credit card debt that appellee had accrued on cards in her own name during the course of the marriage. Appellant says the evidence showed that appellee was the one who got the credit cards, that the cards were not joint accounts, that appellee admits she made all the charges on the cards and that she admits she did not tell appellant the amount of her credit card debt, which totaled a little more than $60,000.
Appellant argues that he did not "endorse nor ratify the credit card activity." He says the evidence shows he tried to curb appellee's credit spending by closing their joint credit card accounts, and that she thereafter decided to open her own credit card accounts. He says the trial court erred when it ruled that he had acquiesced in the creation of the credit card debt. He argues that appellee actually squandered marital assets (her annual salary for several years) by creating such a high credit card debt that it took her entire salary just to meet the monthly payments on the cards.
Appellant says he made all the mortgage, insurance, tax and utility payments on the properties owned by the parties during the last two years of their marriage. He says he was clearly financially frugal, and he should not now be penalized for the improvident credit card charges made by appellee. He says that the trial court abused its discretion when it ordered him to pay the balances owed on some of the credit cards held in appellee's name.
Appellee responds that the trial court did not abuse its discretion when it ordered appellant to pay a portion of the credit card debt she accrued during the marriage. Appellee does not deny that she alone incurred the debt, or that she did actions during the marriage to keep appellant from learning the amount of the debt. She testified at trial, however, that she opened the accounts and made the charges because appellant kept tight control over the joint accounts held by the parties, and did not give her enough cash to meet all of the family expenses.
She testified that she frequently had to charge groceries, because appellant did not give her enough cash in her food allowance to cover the total cost of the groceries. She also testified that she charged gifts that she and appellant gave to others as a couple for birthdays, anniversaries, Christmas and weddings. She further testified that she charged items for weddings for two of their children.
Finally, she acknowledged that a portion of the charges were for her sole benefit and were for such things as personal clothing and cosmetics. She provided the trial court with an exhibit in which she listed the charges under categories to show what amounts were marital expenses and what amounts were her personal expenses.
She affirmed on the stand that she had taken steps on a couple of occasions to keep appellant from learning the total amount of her credit card debt. The first occasion was when they bought a cottage in Michigan. She asked appellant to leave the room while she discussed her debts with the mortgage broker who was arranging for them to get a loan.
The second occasion happened when appellant wanted to refinance their marital residence. She called the bank to see if appellant could get the loan in his name only. She did not want to be on the refinance mortgage because she did not know if her credit was good, considering all the credit card debt she was carrying. After talking with the bank, she suggested to appellant that he refinance the marital residence alone, which he did. She said she took those steps because in the past when appellant learned of any charges she made, he would quit speaking to her for days or would leave the marital residence, and she did not want to have more confrontations.
She said that after they sold a cottage she inherited from her father, she asked appellant to use the money to "help pay on the charges that I needed help on." She said appellant refused, saying "he was not going to continue working overtime for the rest of his life and he needed to lower our house payments." Both appellant and appellee agreed in their testimony that appellant did use the money from the sale of the cottage to reduce the mortgage on the marital residence. Appellee testified that her credit card debt at that time could have been paid off with the proceeds from the sale of the cottage. However, because it was not paid off, interest continued to accrue and the debt grew bigger.
She testified that at the time of trial, she had closed most of the accounts so that she could not make any more charges on the cards. She was trying to pay off the balances on the cards, and planned to refinance the marital residence to pay off the credit card debt if the marital residence was awarded to her in the property settlement. She said that she quit contributing any of her pay toward household expenses in May 1996, because she was using almost her entire paycheck to pay credit card bills.
The record shows that appellee did not tell appellant the amount of her debt until they were in counseling following his stroke in 1996. Appellant testified that prior to her disclosure he was aware that appellee was purchasing and giving gifts for various events, and that she was not making the purchases with funds he provided to her. He said he never asked how much the gifts cost, and she never told him. He also testified that he knew she was buying groceries and that sometimes she was buying them with a source of funds other than the money he gave her for the food allowance. He testified that when she told him to refinance the marital residence in his name only because of her credit card debt, he asked her to tell him the amount of the debt, but she refused to answer.
The pertinent finding of fact from the trial court on the issue in dispute in this assignment of error reads:
 "11. This Court has previous [sic] defined `marital debt' as follows:
 "Marital debt is a financial obligation incurred by marital parties, or one of the married partners, either for the benefit of the marriage, or for one of the spouses. Where an obligation is created by one of the marital partners solely for his/her own benefit, then the other party should have some knowledge of the creation of that indebtedness, either express or implied, and have acquiesced in the creation of that debt. Link v. Link, DR96-0559 (Lucas Co. Court of Dom. Rel., May 14, 1997).
 "In this case, the Defendant testified that he was aware that the Plaintiff had accumulated credit card debt, although he did not know the identity of the various creditors nor the amount and nature of the debt. The evidence further shows that although the Defendant specifically counseled against incurring credit card debt, he arguably acquiesced in the existence of the debt. However, it is clear that with regard to the family food, the giving of inter-family gifts, and certainly the wedding expenses, he would have directly benefited from those expenditures.
 "The Court has no way of specifically separating the non-marital debt from the marital debt, and then allocating the marital debt with any precision. However, Plaintiff has submitted EXHIBIT 17 which traces the history of her credit card debt from 1992 through the date of trial, showing the identity of the various creditors and the charged amounts. Using the reasonable assumption that the current credit card debt is proportioned in a similar manner, and without any evidence to the contrary, the Court finds that the Plain tiff has accepted sole responsibility for approximately twenty-eight percent (28%) of the current debt. The Court further finds that seventy-two percent (72%) of the current debt would be marital debt which should be evenly divided between the parties. Accordingly, the Court finds that of the Sixty Thousand Three Hundred Seventy-seven Dollars ($60,377.00) of current debt shown in EXHIBIT 15, the Plaintiff shall be solely responsible for Sixteen Thousand Nine Hundred Six ($16,906.00), and the parties should be jointly responsible for the remaining Forty-three Thousand Four Hundred Seventy-one Dollars ($43,471.00) on an equal basis. Unless the parties agree otherwise, Defendant shall be solely responsible for the indebtedness to Shell Oil, Sun Trust, and U.S. Bank (Nations) as the sum total of these three obligations approximates his portion of the marital debt. The Plaintiff shall be solely responsible for the other credit card/installment debts listed in EXHIBIT 15. Each party shall pay the indebtedness as it becomes due and hold the other harmless therefrom. This allocation of marital debt shall become effective as of the date of this Decision."
The trial court then made the following pertinent orders:
 "25. Plaintiff shall pay twenty-eight per cent (28%) of her credit card debt which is calculated to be the sum of Sixteen Thousand Nine Hundred Six Dollars ($16,906.00).
 "26. Plaintiff and Defendant shall both be responsible for the remaining seventy-two percent (72%) of Plaintiff's credit card debt, which is calculated to be the sum of Forty-three Thousand Four Hundred Seventy-one Dollars ($43,471.00) on an equal basis. The Defendant be and is hereby ORDERED to pay the following indebtedness commencing May 1, 1999 and monthly thereafter until the obligations are fully paid and hold Plaintiff harmless thereon:
 "* * * [the trial court listed the separate accounts and the amount of the balance for each account in March for a total allocation of $21,380.56]
 "(The Court notes that Plaintiff refinanced some of her indebtedness since the November 4, 1998 hearing and the above debts approximates Defendant's portion of the credit card debts.) The Plaintiff shall be solely responsible for the other credit card/installment debts of Plaintiff and Plaintiff is ORDERED to hold Defendant harmless thereon. Each party shall pay the indebtedness as it becomes due and hold the other harmless therefrom. This allocation of marital debt shall become effective as of April 5, 1999."
The Supreme Court of Ohio has said that an appellate court may only reverse a trial court's order regarding a divorce property division if the trial court abused its discretion.Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 131. An abuse of discretion "`connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219 quoting State v. Adams (1980), 62 Ohio St.2d 151, 157. Furthermore, while the starting place for an equitable property division is an equal assignment of marital debt and marital assets, after considering all the relevant factors in a case, a trial court may choose to award one party more of the marital debts or marital assets and still have an equitable order. Cherryv. Cherry (1981), 66 Ohio St.2d 348, paragraph one of the syllabus.
Other appellate courts in Ohio considering cases in which one party in a divorce is ordered to pay credit card debt incurred solely in the name of the other party during a marriage have ruled that the orders were not an abuse of discretion. See,e.g. Braylock v. Braylock (Dec. 23, 1999), Cuyahoga App. No. 75459, unreported; Ervin v. Ervin (July 16, 1999), Mahoning App. No. 96 CA 177, unreported. In Ervin v. Ervin, the Seventh District Court of Appeals noted that the trial court was in the best position to determine the credibility of the parties and to decide how the debt should be allocated.
Likewise, we find that in this case the trial court was in the best position to determine the credibility of the parties. Appellee presented evidence to the trial court to show that even though all the debt was from credit card accounts she held in her own name, much of the debt was incurred on purchases that were marital, rather than personal in nature. Furthermore, by his own admission, appellant knew appellee was making the purchases with some source of funding other than the cash he provided to her for household expenses, and he knew that appellee had credit card debt. Therefore, even if appellant was not aware of the exact amount of the credit card debt, he was aware that some debt existed and there is support in the record for the finding of the trial court that appellant in some manner acquiesced in the creation of that debt. We cannot find that the trial court abused its discretion when it ordered appellant to pay half of the portion of credit card debt that was marital debt. Appellant's first assignment of error is not well-taken.
In support of his second assignment of error, appellant argues that the trial court abused its discretion when it ordered him to pay appellee spousal support. Appellant says that when the factors listed in R.C. 3105.18 are considered in this case, it is clear that neither party is entitled to spousal support. He says that while the trial court did not say it was awarding spousal support in order to help appellee manage her "disproportionate expenses arising from her use of credit cards", it appears that must have been the reason for the trial court's order. He argues that he was not responsible for appellee's excessive spending and he should not now be punished for her "financial misconduct".
Appellee responds that the trial court clearly considered all thirteen factors listed in R.C. 3105.18 before it awarded her spousal support. She says the trial court included a lengthy discussion of the factors in its order and that discussion showed that the basis for the order was that appellant has a higher income than appellee, the long duration of the marriage, the enhancement to the standard of living of the couple during the marriage attributable to inheritances appellee received during the course of the marriage that the court found were commingled into marital property, and that spousal support payments made by appellant are tax deductible. Appellee says that a marginal award of $150 per month for five years is not an abuse of discretion.
R.C. 3105.18(B) provides that a trial court may award reasonable spousal support to either party in a divorce following the division or disbursement of property. Furthermore, a trial court's order relating to spousal support will only be reversed on appeal if the appellant can show that the trial court abused its discretion. Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, 24. The trial court must consider the factors listed in R.C.3105.18(B)[1] before entering an order for spousal support and must "not base its determination upon any one of these factors taken in isolation." Kaechele v. Kaechele (1988), 35 Ohio St.3d 93,96.
We have carefully reviewed the record in this case and agree with appellee that the trial court did not abuse its discretion when it ordered appellant to pay spousal support in the amount of $150 a month for five years, or until the death of either party or the remarriage or cohabitation of appellee. As appellee points out, there were several reasons to support the trial court's decision to grant minimal spousal support for a limited time, including the difference in the incomes of the parties that was unlikely to change, the length of the marriage and the increase in the standard of living that resulted from appellee's inheritances. Accordingly, appellant's second assignment of error is not well-taken.
Appellee has presented on assignment of error on cross-appeal which is: "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO AWARD ATTORNEY'S FEES TO APPELLEE." Appellee argues that the trial court should have ordered appellant to pay her attorney fees because appellant caused her tribulation during the marriage by keeping such tight control of the marital finances, and during the divorce by not being cooperative as shown by his failure to attend some settlement conferences. She says that the court should have supplemented the minimal spousal support award by awarding her attorney fees. Appellant did not file any response.
Ohio courts have long applied an abuse of discretion standard to trial court rulings regarding orders relating to attorney fees in divorce cases. See, e.g., Rand v. Rand (1985),18 Ohio St.3d 356, 359; Layne v. Layne (1992), 83 Ohio App.3d 559,568. In addition, R.C. 3105.18(H) reads:
 "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court deter mines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees."
Applying these standards to this case, we conclude that the trial court did not abuse its discretion when it chose not to award attorney fees to appellee.
The trial court made the following statements in its decree to explain its ruling that each party was responsible to pay their own attorney fees:
 "15. Having considered the dictates of Revised Code 3105.18(H), the Court finds that equity and fairness requires that each party be responsible for their respective attorney's fees. Each of the parties is employed and earns a substantial wage. The assets and liabilities of the parties have been equitably divided. Additionally, the Court has reviewed the entire record in this case and fails to find any evidence of conduct attributable to the Defendant that could be construed as being obstructive. The Court is satisfied that the Defendant, who was not in favor of these proceedings, defended the case in good faith and without undue delay."
Our review of the record supports the findings of the trial court. Accordingly, appellee's sole assignment of error on cross-appeal is not well-taken and is denied.
The judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed. Appellant is ordered to pay the court costs of his appeal and appellee is ordered to pay the court costs of her cross-appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ PETER M. HANDWORK, J.
JAMES R. SHERCK, J., MARK L. PIETRYKOWSKI, J., CONCUR.
[1] R.C. 3105.18(C) provides:
 "(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed or distributed under section 3105.171 [3105.17.1] of the Revised Code;
"(b) The relative earning abilities of the parties;
 "(c) The ages and the physical, mental, and emotional conditions of the parties;
"(d) The retirement benefits of the parties;
"(e) The duration of the marriage;
 "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 "(g) The standard of living of the parties established during the marriage;
"(h) The relative extent of education of the parties;
 (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 "(l) The tax consequences, for each party, of an award of spousal support;
 "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 "(n) Any other factor that the court expressly finds to be relevant and equitable."